IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 27, 2015

## STATE OF TENNESSEE v. DARRELL RAY BEENE

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-1008     Cheryl A. Blackburn, Judge**

_____

**No. M2015-00231-CCA-R3-CD – Filed January 12, 2016**

_____

A Davidson County jury convicted the Defendant, Darrell Ray Beene, of aggravated robbery, and the trial court sentenced him to twenty years in the Tennessee Department of Correction.  The trial court ordered that the Defendant's sentence be served consecutively to the Defendant's forty-two year sentence in another case.  On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction and that his sentence is excessive.  After a thorough review of the record and applicable authorities, we affirm the Defendant's conviction and sentence.

**Tenn. R. App. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and D. KELLY THOMAS, JR., JJ., joined.

David Harris, Nashville, Tennessee, for the appellant, Darrell Ray Beene.

Herbert H. Slatery III, Attorney General and Reporter; M. Todd Ridley, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from a robbery that occurred in an apartment complex on December 20, 2011.  A Davidson County grand jury indicted the Defendant for one count of aggravated robbery.  At his trial on this charge, the parties presented the following evidence:  Audrey Myers testified that she was thirty at the time of trial.  On December 20, 2011, she visited her boyfriend, Jude Mena, who lived in the Green Leaf Apartments in Hermitage.  She arrived at around 8:30 or 9:00 p.m., parked her car, and started

walking toward his apartment. Ms. Myers said she heard someone call to her. She looked back and saw two black men near a white truck. The man near the driver's side door came towards her. She thought little of it because she knew most of the people that lived in the apartments near Mr. Mena.

Ms. Myers testified that, as the man approached her, he was speaking but she could not understand what he was saying to her. When he got near to her, she understood him to say "give me your wallet." Ms. Myers told the man that she would not give him her wallet. He then brandished a gun and told her again to give him her wallet. She again refused. The man said, "what is wrong with y'all mother f***ing people, y'all ain't scared anymore," and he pointed the gun to her chest and told her to give him her wallet. Ms. Myers said that she told the man that she did not have a wallet, but she handed him some money she had in her pocket, her phone, and her car keys. He took those from her, told her he would leave her keys nearby, and then told her to run and pointed the direction he wanted her to run. She told him that she did not want to run that direction and indicated that she wanted to go in the other direction. The man was unyielding and told her to run in the direction that he had indicated. Ms. Myers said that she complied and ran through a different breezeway and then back behind the apartment complex to get to the backdoor of Mr. Mena's apartment. She said that she banged on the door, Mr. Mena and his friend opened the door, and she entered the apartment, told them what had happened, and they called 911. She said that, at one point, she spoke with the 911 operator, but that either Mr. Mena or his friend placed the call.

Ms. Myers said that she, her boyfriend, and his friend went back to the parking lot but the white truck was gone. They found her keys in the parking lot. The police came a few minutes later. Ms. Myers said that she described to police officers as best she could her assailant and the man with him. She recalled telling them that her assailant's eyes were "baggy and droopy" and that he had a "scraggly" beard. She recalled that her assailant had some moles and/or pock marks on his cheeks that stood out.

Ms. Myers testified that she had used her cell phone to call her boyfriend on multiple occasions and that his number would have been listed in her phone. Ms. Myers recalled that while she and Mr. Mena were speaking with police his phone rang. It was her phone calling, but the call must have been placed inadvertently because there were only mumbled noises on the line. Ms. Myers said that she wanted her phone returned because it contained pictures special to her such as those of her daughter's first day of kindergarten, so Mr. Mena repeatedly called and texted her phone with her request during that night and into the next day. Ms. Myers said that she heard Mr. Mena speak with someone on several occasions. Ms. Myers reported this to the police.

2

Ms. Myers said that on December 22, two days after the robbery, Mr. Mena returned her phone to her. She explained that he arranged to meet the person with whom he spoke on the phone. Mr. Mena then contacted police and informed them of the plan. The police were present but concealed during the transaction. Ms. Myers said that when she received her phone she saw that someone had erased her pictures.

Ms. Myers testified that two weeks after the robbery a detective called her and asked her to come and view a photographic lineup. Accompanied by Mr. Mena, Ms. Myers went to the Hermitage precinct where she met Detective Vallee for the first time. He showed her an array of six pictures, and she identified a photograph of the Defendant as the man who had robbed her. She said she had no doubt about her identification.

During cross-examination, Ms. Myers testified that she could not offer more details about the white truck she saw the Defendant and the other man standing near. She said that she knew it was not a Dodge and that it was not a new model but that she could not be more specific. She said that the Defendant brandished the gun by pulling it up from his right hip area. She estimated that the assailant was in his fifties. She agreed that she described her assailant to the police as tall and skinny.

Ms. Myers testified that the police did not show her a photographic lineup until almost three weeks after this event. She said that, during that time, it concerned her that the man who had robbed her was still free. She said that, after she identified the Defendant, she still felt very anxious and scared.

On redirect-examination, Ms. Myers testified that she in part identified the Defendant because he had baggy eyes and marks on his face. She said that she was in close proximity to the Defendant when he robbed her. Ms. Myers testified that her boyfriend at the time of these events, Mr. Mena, was very sick at the time of trial. He contracted MRSA as a result of a back surgery, and it rendered him unable to be at trial.

Russell Freeman, an officer with the Metropolitan Nashville Police Department, testified that he responded to the 911 call about this robbery. Officer Freeman recalled that police received the call about a robbery at 8:45 p.m. and that he arrived at the scene at 9:00 p.m. Officer Freeman recalled that he was the third officer to respond. He said that he took Ms. Myers's statement, which included a description of the person who had robbed her and a general description of the car she saw him near, a white full-sized pickup truck. Ms. Myers did not recall any specific details about the pickup truck.

Jeff Ball, a retired detective with the Metropolitan Nashville Police Department, testified that, before he retired, he assisted the lead investigator, Greg Jennings, in the investigation of this case. Detective Ball testified that, as part of his investigation, he met

with Mr. Mena, who informed him that he planned to meet the person in possession of Ms. Myers's phone at a local Burger King. The detective said that he and another detective, Detective Injaychock, drove to that location and then to a second location, a Wendy's restaurant, where the meeting was to occur. The two detectives were not in uniform and drove an unmarked police car. They parked near Mr. Mena in the parking lot. The detective recalled that it was raining heavily. A black man exited the Wendy's, went directly to Mr. Mena's vehicle, opened the passenger's side door of Mr. Mena's vehicle, and got into the car.

Detective Ball said that he and Detective Injaychock kept the man from shutting the door, fearing that Mr. Mena might be carjacked. They took the man into custody. The man said his name was Pierre Wilson. Mr. Wilson offered the detectives information that they could verify, and the detectives relayed that information to their supervisor. Detective Ball testified that he released Mr. Wilson and gave the phone to Mr. Mena.

During cross-examination the detective agreed that he did not take the phone into evidence. He said it was wet and that moisture destroys fingerprints. Detective Ball described Mr. Wilson as a tall, skinny black man.

Gregg Jennings, a detective with the Metropolitan Nashville Police Department, testified that he was the lead investigator in this robbery. He said that he did not respond to the scene, as there was no evidence there, but met with Ms. Myers a day or two after the robbery. Detective Jennings recalled that Detective Ball and Detective Injaychock assisted him with this investigation. Detective Ball made a report, which he gave to Detective Jennings, regarding the return of the phone, and the report listed the Defendant as a suspect. Detective Jennings sought and obtained an arrest warrant for the Defendant. Officers arrested and booked the Defendant, and the detective used his booking photo to create a photo array for Ms. Myers to view. He used pictures similar to those of the Defendant when creating the array. The detective showed the photo array to the jury.

Detective Jennings testified that he had a family emergency out of state so he was unable to show Ms. Myers the photo array. Detective Vallee showed it to her instead. He learned, however, that Ms. Myers had identified the Defendant's photograph as belonging to the man who had robbed her.

During cross-examination, Detective Jennings testified that there was no forensic evidence recovered during his investigation. The detective listed the items Ms. Myers reported taken from her on the evening of the robbery: $200 in cash, a cell phone, and car keys. He agreed that the victim found her car keys in the parking lot. He agreed that the police did not process the keys for fingerprints.

4

Andrew Vallee, a detective with the Metropolitan Nashville Police Department, testified that he became involved in this case when Detective Jennings had a family emergency requiring him to leave the state. He said that Detective Jennings asked him to show Ms. Myers a photographic lineup, which he did. He said that he did not know which man in the lineup was the suspect. He gave Ms. Myers the instructions for viewing the lineup, and then he showed Ms. Myers the lineup. Ms. Myers chose person number two as being a photograph of the man who had robbed her. That picture was of the Defendant. The detective indicated as much on the photographic array, and he left the array for Detective Jennings. Detective Vallee said that concluded his involvement in this case.

Albert Vincent, a sergeant with the City of Goodlettsville Police Department, testified that he stopped the Defendant, who was driving a white Ford Ranger, on December 21, 2011. A man named Pierre Wilson accompanied the Defendant as a passenger in his vehicle. Sergeant Vincent testified that he was not familiar with either of these men but said that he cited the Defendant and then took him into custody because the Defendant was driving on a suspended license. Sergeant Vincent had the Defendant's vehicle towed into custody. The sergeant said he was unaware of the Defendant's possible involvement in another crime at the time of the Defendant's arrest. During cross-examination, Sergeant Vincent agreed that white pickup trucks were common and that the one that the Defendant was driving was not unique.

Wesley Terry, testified that he was an officer with the Metropolitan Nashville Police Department in August 2011, but he had since obtained civilian employment. Mr. Terry testified that he interviewed the Defendant after police stopped him driving a 2001 white Ford Ranger. He learned that the Defendant's date of birth was May 4, 1974. His report created that evening listed that the Defendant was 5'8" tall and weighed 170 pounds.

Based upon this evidence, the jury convicted the Defendant of one count of aggravated robbery.

## B. Sentencing

At the sentencing hearing, the parties agreed that the Defendant was a multiple offender. The Defendant had previously been convicted of one A felony, a B felony, two C felonies, and a D felony. The trial court noted that, as a multiple offender convicted of a Class B felony, the Defendant's applicable sentencing range was twelve to twenty years.

The trial court then stated that it must determine whether the Defendant's sentence should run concurrently with or consecutively to a sentence the Defendant had received in another case, 2013-A-542, for his convictions for attempted especially aggravated kidnapping and robbery. The trial court noted that both the Defendant's sentence in this case and his sentence in case 2013-A-542 must run consecutively to the sentence in a third case for which the Defendant was on parole at the time of the subsequent offenses.

The State then submitted the presentence report, along with a victim impact statement, and the Defendant's juvenile history statement, which showed he had been adjudicated guilty of aggravated burglary in 1992. This concluded the State's proof at sentencing.

The Defendant's counsel noted that the Defendant was forty years of age and that the trial court had sentenced him to forty-two years in case number 2013-A-542. He noted that more time would not serve the ends of justice as the Defendant would already be of old age when released. He asked the trial court to run the Defendant's sentence concurrently with his sentence in 2013-A-542.

Based upon this evidence, the trial court found:

Let's use the sentencing act I'm required to follow. 40-35-102 talks about the purpose of the sentencing act, matters to be considered are at 40-35-210, the evidence at trial, the sentencing hearing. And we had a trial in this matter, and we're going to incorporate that testimony into this hearing, in the sentencing hearing. The presentence report, we had one prepared for this case. It does leave out the juvenile record, but we're incorporating the prior report. The principles of sentencing, which I just mentioned, the arguments as to alternatives, there are no alternatives, there are no alternatives in this case. One it's an aggravated robbery, and two he's serving – it's consecutive to anything, he's on parole. He has another sentence he's currently serving. The nature and characteristics of the conduct, the enhance[ment] and mitigating factors, the statistical information, [the D]efendant's statement.

Looking at the enhance[ment] factors, factor number one applied. He has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Clearly he – it only takes two to establish a Range 2 offender. He has an A, B, a D, and two C's, so he does have prior convictions in addition to those necessary to establish the appropriate range. There's at least four misdemeanors. He's spent a good deal of his life in prison because, as the record show[s], he

6

was found guilty on those earlier sentences to – it looks like twenty-seven years was the total effective sentence in cases 93-D-1462 in Counts 1 and . . . then there's 93-D-1464, which was a six-year sentence on a[n] . . . attempt to commit rape and another one, which . . . it was a total sentence of twenty-five years. Not twenty-seven but twenty-five. He served that time.

My recollection is that these events started occurring reasonably quickly after he was out of custody. He picks up a violation of the sex offender registry but that actually, if you look at the dates, are around the same time as this. This one occurred 12-20 of 2011 whereas the events for the one that we tried previously where the offense date was January 1st of 2012. So shortly after getting out of prison on that long sentence he's now back doing very similar things. The other enhance[ment] factors – so he's involved in other criminal convictions in addition to that to establish the range.

Factor number eight applies. He's failed to comply with conditions of a sentence involving release into the community.

Factor number nine does not apply.

Factor number thirteen does. He was on parole at the time.

And factor number sixteen, prior juvenile record adjudicated as something that could constitute as a felony if tried as an adult.

Looking at any mitigating factors, looking at all of them, I don't see anything that applies at all. I mean, his criminal behavior threatened serious bodily injury, armed robbery with a deadly weapon. So all enhance[ment], no mitigating.

I'm going to sentence him to a twenty-year sentence as a Range 2 offender. It has to be served at eighty-five percent.

Now, the issue is whether or not [his sentence should run] consecutive or concurrent [to his sentence from previous convictions]. It's required to be consecutive to those offenses for which he was on parole. There's no option about that. It's whether or not these are going to be consecutive or concurrent with 2013-A-542, which I've already sentenced him to forty-[two] years on. Because of his history I found him to be a

7

dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high.

If you look at all these cases that we've heard, especially the one that occurred after – so we have an event that occurs in December, one that occurs – one that occurs in January, all involving women that are in an apartment complex trying to I guess – in the dark of the night they come up and are, I guess, robbed and another one is attempted to be kidnapped. I mean, there was clear indication that's what was going in that particular case. I find his behavior – he's a dangerous offender who given his prior history – he just got out of prison. His behavior does indicate little or no regard for human life and [he] has no hesitation about committing crimes in which the risk to human life was high. Having a weapons and pointing it at somebody is a high risk. But I have to go further and determine according to *Wilkerson* that the consecutive sentences are the aggregate term reasonably relates to the severity of the offenses and it is necessary in order to protect the public from further serious criminal conduct by the [D]efendant. I think that is here. Given what he was in prison for, the recency in which he was from prison, he just gets out, he violates the sex offender registry, and then these are happening at the same time. Obviously he needs to be – society needs to be protected from him from further serious criminal conduct. He didn't go out and commit a theft, though, that was part of it. It was armed robbery. And the other case was an attempted kidnapping. They found him guilty of robbery, but he was charged with aggravated robbery. All those lead me to believe the appropriate sentence is the twenty years consecutive to his other case as well as consecutive to his – to what he was on parole for.

It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his conviction and that his sentence is excessive.

## A. Sufficiency of Evidence

The Defendant contends that the evidence is insufficient to sustain his convictions. As the bases for this contention, he notes that there was no physical evidence against him and that the victim's initial description of her robber differed markedly from the

8

Defendant's appearance. He notes that the man who returned the victim's cell phone to police, Mr. Pierre Wilson, more aptly fit the victim's description of her assailant. The State counters that the victim's identification of the Defendant as her assailant is a sufficient basis upon which the jury could base the Defendant's conviction.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e), *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). The jury decides the weight to be given to circumstantial evidence, and "[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (citations omitted). "The standard of review [for sufficiency of the evidence] is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999); *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956). "Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

9

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1996) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)). This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *Goodwin*, 143 S .W.3d at 775 (citing *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000).

In any case, the identity of the perpetrator is an essential element of any crime, and therefore the State must be prove it beyond a reasonable doubt. *State v. Rice*, 184 S.W.3d 646, 662 (Tenn.2006) (citing *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn.1975). We would also note that issues of identity and credibility are classic jury questions. *State v. Lance Murray*, No. W2009-00332-CCA-R3-CD, 2010 WL 1006720, at *6 (Tenn. Crim. App., at Jackson, Mar. 19, 2010) (citing *State v. Gregory Mullins*, No. E2004-02314-CCA-R3-CD, 2005 WL 2045151, at *5 (Tenn. Crim. App., at Knoxville, Aug. 25, 2005), *no Tenn. R. App. P. 11 application filed*), *no Tenn. R. App. P. 11 application filed.* Questions that concern the credibility of the witnesses are resolved by the trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *Liakas*, 286 S.W.2d at 859. This Court does not second-guess the weight, value, or credibility afforded to the evidence by the jury. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978); *State v. Grace*, 493 S.W.2d 474, 479 (Tenn.1973).

In the case under submission, the Defendant contests the evidence with respect to his identity as the perpetrator of this offense. We conclude that the evidence is sufficient to establish the Defendant's identity as the perpetrator of this robbery. The victim saw two African-American men standing near a white truck in the parking lot of her boyfriend's apartment. One of the men began to call to her, but she could not understand what he was saying. The man approached her and asked her for her wallet, phone, and keys. After he threatened her with a gun, she gave him the money she had with her, her phone, and her car keys. The victim told police officers that her assailant's eyes were "baggy and droopy" and that he had a "scraggly" beard. She recalled that her assailant had some moles and/or pock marks on his cheeks that stood out.

Shortly after the robbery, Mr. Mena and the victim began calling her phone shortly, and they successfully set up a meeting to retrieve the phone. Law enforcement officers accompanied Mr. Mena to the meeting, where they apprehended Pierre Wilson returning the phone. After interviewing Mr. Wilson, officers decided they should show the victim a photographic lineup containing the Defendant's photograph.

In a separate, unrelated incident, the Defendant was arrested on December 21, 2011, the day after the robbery, for driving on a suspended license. He was, at the time, driving a white 2001 Ford Ranger pickup truck.

Police officers used the booking photo from the Defendant's arrest the day after the robbery in the photographic lineup. The officer that showed the victim the lineup did not know which photograph depicted the suspect. Upon seeing the Defendant's photograph, the victim said that the picture of the Defendant looked "exactly" like the man who robbed her. This evidence is sufficient to sustain the Defendant's conviction.

We note that the victim had told the police officer that the Defendant was tall and skinny and that the proof was that the Defendant was 5'8" in height. The victim explained, however, that the Defendant probably looked larger to her because he was holding a weapon. As we previously stated, however, the Defendant's identity as the perpetrator of this offense is a classic jury question, and we cannot second-guess the jury's determination that the victim's identification of the Defendant was credible. The Defendant is not entitled to relief on this issue.

### C. Consecutive Sentencing

The Defendant next contends that the trial court erred when it ordered that his sentences run consecutively. He asserts that the trial court's ordering that his sentence in this case, twenty years, run consecutively to his sentence of forty-two years for another case is "gross[ly] disproportiona[te]" to his offense. The State disagrees, stating that the trial court properly sentenced the Defendant. We agree with the State.

In *State v. Bise*, the Tennessee Supreme Court reviewed changes in sentencing law and the impact on appellate review of sentencing decisions. The Tennessee Supreme Court announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). To find an abuse of

discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.* at 554-55; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). The reviewing court should uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. So long as the trial court sentences within the appropriate range and properly applies the purposes and principles of the Sentencing Act, its decision will be granted a presumption of reasonableness. *Id.* at 707.

Our Supreme Court extended the *Bise* standard to appellate review of the manner of service of the sentence and consecutive sentencing. The Court explicitly held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to within-range sentences that reflect a decision based upon the purposes and principles of sentencing, including the questions related to probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). In *State v. Pollard*, the Court held, "the appropriate standard of appellate review for consecutive sentencing is abuse of discretion accompanied by a presumption of reasonableness." 432 S.W.3d 851, 860 (Tenn. 2013). We also recognize that the defendant bears "the burden of demonstrating that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. T.C.A. § 40-35-103 (2014).

Consecutive sentencing is a matter addressed to the sound discretion of the trial court. *State v. James*, 688 S.W.2d 463, 465 (Tenn. Crim. App. 1984). A trial court may order multiple sentences to run consecutively if it finds, by a preponderance of the evidence, that at least one of the seven statutory factors exists. T.C.A. § 40-35-115 (b)(1)-(7) (2014). One of those factors is that, "The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about

committing a crime in which the risk to human life is high." T.C.A. 40-35-115(b)(4). In order to find that a defendant is a dangerous offender, a court must also find that "(1) the sentences are necessary in order to protect the public from further misconduct by the defendant and (2) 'the terms are reasonably related to the severity of the offenses.'" *State v. Moore,* 942 S.W.2d 570, 574 (Tenn. Crim. App. 1996) (quoting *State v. Wilkerson,* 905 S.W.2d 933, 938 (Tenn. 1995)); *see also State v. Lane,* 3 S.W.3d 456, 461 (Tenn. 1999). In addition to these criteria, consecutive sentencing is subject to the general sentencing principle that the length of a sentence should be "justly deserved in relation to the seriousness of the offense" and "no greater than that deserved for the offense committed." T.C.A. § 40-35-102 (1), -103 (2) (2014); *see also State v. Imfeld*, 70 S.W.3d 698, 708 (Tenn. 2002).

The trial court determined that the Defendant was a dangerous offender. It stated:

Because of his history I found him to be a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high.

If you look at all these cases that we've heard, especially the one that occurred after – so we have an event that occurs in December, one that occurs – one that occurs in January, all involving women that are in an apartment complex trying to I guess – in the dark of the night they come up and are, I guess, robbed and another one is attempted to be kidnapped. I mean, there was clear indication that's what was going in that particular case. I find his behavior – he's a dangerous offender who given his prior history – he just got out of prison. His behavior does indicate little or no regard for human life and has no hesitation about committing crimes in which the risk to human life was high. Having a weapons and pointing it at somebody is a high risk. But I have to go further and determine according to Wilkerson that the consecutive sentences are the aggregate term reasonably relates to the severity of the offenses and it is necessary in order to protect the public from further serious criminal conduct by the [D]efendant. I think that is here. Given what he was in prison for, the recency in which he was from prison, he just gets out, he violates the sex offender registry, and then these are happening at the same time. Obviously he needs to be – society needs to be protected from him from further serious criminal conduct. He didn't go out and commit a theft, though, that was part of it. It was armed robbery. And the other case was an attempted kidnapping. They found him guilty of robbery, but he was charged with aggravated robbery. All those lead me to believe the

13

appropriate sentence is the twenty years consecutive to his other case as well as consecutive to his – to what he was on parole for.

The record shows that the trial court made the additional factual findings required to determine that the Defendant was a dangerous offender. The trial court emphasized the serious nature of the offenses involved and the danger it presented to the public, highlighting that the Defendant robbed women using a weapon while they were walking alone in an apartment complex at night, even attempting to kidnap one of the women. The trial court stated on the record that it found consecutive sentencing was warranted to protect society from further serious criminal conduct by the Defendant. Thus, we conclude that the trial court properly exercised its discretion in ordering the Defendant to serve his sentences consecutively.

In sum, the record reflects that the trial court carefully considered the evidence, the nature of the criminal conduct involved, the presentence report, and the purposes and principles of sentencing prior to imposing consecutive, within-range sentences of confinement. The Defendant's sentence is justly deserved considering the severity of his offenses. Therefore, the Defendant has failed to establish that the trial court abused its discretion in imposing his sentences and he is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the evidence is sufficient to sustain the Defendant's convictions and that the trial court properly sentenced the Defendant. As such, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

14